Good morning. Patrick Dwyer appearing for the appellant. Alexey Predybaylo. Can everyone hear me? We have you on a very small screen. I will move up closer to my camera so hopefully you can see me alright. And I would like to reserve four minutes for rebuttal. Alright. Watch your clock. Thank you. The primary issue in this case from the district court's decision is whether or not the use of force was de minimis. I think that the record we have produced on appeal with the appropriate case law shows that in fact the use of force was anything but de minimis. The medical record is essentially undisputed. Mr. Predybaylo had a medical expert testify as to his injuries which confirmed the jail medicals analysis that he had a mild traumatic brain injury, lost consciousness, had abrasions and scratches, etc. And had symptoms for approximately two years after the incident. Counsel, does our case law suggest that we determine whether excessive force was used based upon whether there was a medical adverse fallout from what occurred? Or is it judged based upon the reasonableness of what the officer did at the time? Well, Your Honor, I have not found a case that answers that question exactly in the manner you put it. The decisions, for example, that I cited in my briefing really speak about both the necessity for the force, does it make sense? And second, what was the nature of the injury? I think the leading case here is Rice v. Morehouse where a basically identical takedown procedure was done which resulted in quote long-term physical pain for which he received medical treatment. Counsel, we've lost you. Oh, there you go. Okay, you're back. Can you hear me? What was the case you cited again, please? Rice v. Morehouse? Yeah. It's on page 24 of my opening brief. Is that the case that you think best puts the officers on notice that what they were doing was an unconstitutional violation of your client's rights? In other words, for qualified immunity purposes, is that your best case? Well, for qualified immunity purposes, no, Your Honor, because that Rice v. Morehouse was a 2021 case. However, I do cite in my briefing an extensive number of cases, in fact, a long judicial history that put the officers on notice. Okay, what's your best case for qualified immunity purposes that you think is close enough to what happened here that we should rely on that to determine that the officers were not entitled to qualified immunity? Give me a moment, Your Honor, to make sure I get a correct statement to you. I apologize. All right. I thought we would get to the issue a little later, so let me go down here. The extension section in the... Say that again, please. We're losing you. Page 23. Say that again, please, counsel. Page 23 of my reply brief. It's an extensive discussion. The law of the cases would have informed the officers that there was not... Okay, well, you're referring us to a page in your reply brief. What is the best case? What is the best case for Pearson purposes that you believe informed the officers that what they were doing was illegal and unconstitutional? In the Supreme Court, the Bell case is the leading case. Bell versus what? Bell versus Wolfish. And that is followed by Hudson versus McMillan. Those cases really, I think, establish a clear law that jail officers conducting strip searches are advised not to use excessive force conducting the strip search. And then in the Ninth Circuit, there's a long line of cases that begin with the Mitchenfelder case in 1988. And they go all the way down through... Gosh, quite recently, there's quite a few. I don't know that there's one in particular that stands out. There's about a half dozen cases that I've cited and reviewed, all of which indicate that the amount of force used was excessive. So I wouldn't say there's one in particular. I think that the line of cases over a couple of decades made it very clear that the amount of force to be used to strip is limited. And it really has to be... And officers know that, and they have to know that they cannot use any force in a strip search unless there's some physical aggression by the person to do a strip search. There's some physical resistance. You admit that they... That's some kind of physical resistance. You admit that the officers could use some type of force in order to carry out their duties, right? They could use force in a strip search only if it's necessary to complete the search. In this case, there's no evidence that any force was necessary to complete the strip search. All of the evidence, in fact, shows that my client fully cooperated, took off his shirt, shoes, and socks, without any problem. And then, even though there had been no problem with what he was doing, Deputy Hopek grabbed him by his thumbs behind his back, clearly started applying force that was unnecessary. And in fact, Deputy Hopek's grabbing him by the thumb behind his back made it impossible for my client to take off his pants, the only clothing he had left on. So, the argument of the appellees about the use of force is rather nonsensical. They admitted that my client, without difficulty or a problem, took off his shirt, shoes, and socks. Now, you cannot do those things and remain completely facing the wall. You have to be able to move away a little bit to reach down and take off your shoes and socks and your shirt. They admitted he did all that peacefully, without a problem. Deputy Hopek testified that it was after that had been done that he grabbed him by his thumbs behind his back. Well, what purpose would that be if he still needed to take his pants off? Why didn't they just ask him to take his pants off, which he could have done, and that would have been the end of the search? There was simply no need for Deputy Hopek to grab him by his thumbs, and there was absolutely no cause for them to pull his legs out from underneath him, causing him to fall headfirst onto the hard floor. So, it's your position that this needs to go back to the trial court to determine whether the force used was permissible or reasonable in line with the court, with the law of the court? Your Honor, I set forth in my briefing that this court has the, on a de novo review of the cross motions, has the ability to decide the case right here. It can decide the summary judgments if it wishes to. If the court does not find that there are any facts that a jury has to decide, which I think is the situation here, then you can go ahead and rule on it. Counsel, doesn't the jury, I mean, isn't it a question of fact as to whether or not Freddie Balow was resisting the search? Isn't that a question of fact? I don't think, well, it would be a question of fact. However, the evidence we have in the record is more than necessary to establish what actually did happen and what didn't happen. And therefore, the judge may rule because there's no issue left for a reasonable jury to decide. Yes, it is a question of fact, but the evidence is overwhelming and there's no reason to send this to the jury. So we're looking at whether, I mean, obviously the police officers wouldn't take the same view of what happened as your client. Correct. And we've got their testimony and it's very carefully laid out in my briefing. And if you go through all of their testimony, which would be the same testimony they would give at trial, they had no explanation or excuse for using force. The independent witness, Sergeant Hall, who stood at the doorway when he watched the video, he's right there at the doorway. He watches the whole event and he says, Mr. Freddie Balow did not physically resist. He cooperated. He didn't see anything unusual. There you have your third-party independent witness. He's not representing the sheriff's department. He's not representing my client. He's an independent witness. He said, Mr. Freddie Balow didn't do anything to warrant the use of force. I think that's conclusive evidence more sufficient to sustain a summary judgment by this court. You want to reserve the rest of your time? Yes, that's fine. Thank you. Thank you. Okay. Mr. Fessenden. Thank you, Your Honor. Carl Fessenden on behalf of the defendants and the LEs in this case. I would like to start with a comment that was just made by Your Honors, that the officers do not take the same view as what happened, so there may be a disputed issue of fact. I think it's very important that it's clear that our summary judgment was based upon Mr. Freddie Balow's words, not the words of our officer. It was based upon his deposition testimony. More importantly, it was also based upon what he did not say, and so we took what he said happened. He was never kicked. He was never punched. He said he was confused. He does say he had his hands put behind his back. He was not handcuffed, and then his legs were pulled, or his pants were pulled. Now, importantly, he says in his deposition, and this is the record, 2 ER 205 and 241, he says as he's falling, the officers lost control of him. They could not handle him. He doesn't say he slammed to the ground. He doesn't say anything like that. He says, I'm falling down, and the officer lost control of the hands that were holding him, and he falls on a padded floor. That's what happened in this case. Now, what he did not say is what the lower court picked up, which was there's a specific UMF on behalf of my clients that say he repeatedly, while not handcuffed, he repeatedly turned around. Mr. Prado-Bailo does not say I did not do that. All he says is I was cooperative. Well, subjectively, he may have been cooperative. He may have thought he was being cooperative. That doesn't mean he was not turning around, and the officers did testify that in their experience, when somebody keeps turning around and not listening to their direction and not facing the wall, that creates security concerns. And so, as to the context, it's his words and then what he doesn't say, which is at issue in this case and what the record's about. And then we have the government's interest. Again, not disputed. They don't dispute it. They don't dispute that evidence collection is an important state issue. That's what was going on here. They were collecting his pants for evidence. They do not dispute that security of an officer is an important state interest. They do not dispute that safety in the jail is an important state interest. We know that Mr. Prado-Bailo had just been arrested. He evaded police. He had guns. He had drugs. This was a guy that they had concerns about going in. Counsel, let me ask you this. Does the record show that the officers involved here in the strip search were aware of what Mr. Prado-Bailo was charged with and the drugs and the guns? Yes. That's in the record. Where is that in the record, please? Now, I wish I could tell you because I did not make that site. It is referenced in the court's order. The court's order is the first document in the record. And in that order, he does cite to the evidence about his background and what the... I don't have that in front of me, Your Honor. Okay. But you say it did occur, right? They did know? They did. The arresting officer, Hall, who Mr. Dwyer just identified, he was standing right there. And he was the arresting officer. Okay. So at least one of those officers was aware of what he was arrested for, the drugs and the gun, right? Yes. And, you know, we talk about the government's interest. Yes, he's passively resistant. That is true. But the officers say, in our experience, when these things happen, they often quickly escalate, so we take control of it before that happens. Again, they don't dispute that. And so the government's interest is strong by any account. And this is a jail. And so the court was correct. The use of force in this case was very de minimis, insignificant in a lot of ways. And just because he was hurt doesn't mean anything in the analysis of whether the use of the force was appropriate. Now, a comment on a couple of things. I'm wondering, though, he says his legs were kicked out from under him, and he fell face first. And isn't it a question of fact as to whether that's excessive? And also, I guess a subsidiary question is, if the officers interpreted this as uncooperation, why didn't they follow the procedures set forth in their own guidelines? First part of your question. They could have just left him alone in the cell, right? No, they could not. Why not? Because he was arrested on drug charges, and the concern is that he's hiding drugs somewhere in his body that cannot be seen. So they can't leave him by himself. They're also collecting evidence, and they can't leave somebody with the evidence by themselves. That's in the record. In fact, it's in his brief that he references those things. Well, the guidelines that are in the record say that if the refusing inmate shall remain in isolation until he or she complies or the supervisor authorizes the strip search. And if the inmate continues to refuse, the supervisor may authorize a forcible strip search. That didn't happen here. They just took his legs out from under him. So two things. The record is not that he took his legs out from under him. They pulled his pants down while his hands were being held, and he went to the ground. He went, he volitionally went to the ground? Well, they were purposely taking him to the ground, sure. Yes, absolutely. But like I say, what his client said, Mr. Prado-Bailão, the guy lost control of his hands. He wasn't slamming him to the ground like has been argued. But I think you raise an important point on the policy, Your Honor. The policy that you're referring to does not apply here. He wasn't in the process of a strip search. A strip search is a specific thing that includes the inspection of genitalia and a person's buttocks. And his first sentence in his opening brief says it. This was about collection of evidence. That policy that he cites has no application because he wasn't being strip searched. He was going to be strip searched, but first they were removing his clothes because the officer hall wanted them for evidence. Secondly, even if broadly that policy applied, that policy requires that the inmate refuse the strip search. There is no evidence that he refused a strip search. In fact, the evidence is that he didn't refuse a strip search. So that policy would have no application. What do we do with Officer Hall's testimony, and he was an eyewitness, that he did not remember an appellant being angry or fighting or uncooperative or resisting? Your Honor, you have to read all of Officer Hall's testimony as pointed out by the lower court. That's not really what he says. What he says is, I don't remember this event. He was shown the video during the deposition. And by looking at the deposition, his response, or the video, his response was, I don't recall anything happening one way or the other. He doesn't have a specific recollection. He does not say, I witnessed this whole thing and nothing happened. He does not say that. He says, I don't recall, which is very different. I was talking, Your Honor brought up a question about the policy, which goes to the Monell claim that the court never got to the substance of it because they found no constitutional violation. But if this court did get to the substance of it, I do think it's important. The policies that he's referring to don't even apply here because it wasn't part of a strip search. And I do think there's another fundamental problem. Even if you assume those policies apply, or the written policy applied, there's no evidence that had he been put in a cell, he would, by himself, he would have cooperated. And then force would not have been used. It's just utter speculation. And I think just as importantly, this unwritten policy that he refers to, there's no evidence that that policy is unconstitutional or was somehow the moving force between, to this event. This event was a response to Mr. Crady Bilow not following direction. And the officers clearly, even under the written policy, have the ability to use force if somebody is not cooperating. And in this case, they did use force. But the force was very appropriate given the circumstances. They just took him to the ground so they could control him. They didn't slam him to the ground as is argued throughout the brief. The evidence doesn't support that. If they didn't slam him to the ground, or if he didn't fall forcibly to the ground, how do you suffer such severe brain injury? Well, he didn't suffer severe brain injury. The record does not show that. He did have some injury. He did have some injury. He was hospitalized for five days, wasn't he? Excuse me. I'm sorry. I did not hear you. Wasn't he hospitalized for five days? I guess it says minor traumatic brain injury. Five days in the hospital. But that's evidence of force, right? That's the extent of the injury. It is evidence of the force. But again, you have to understand what his client says. His client says, as I'm being taken to the ground, he loses control of my hands. He doesn't say he then picked me up and slammed me to the ground. He was putting me to the ground. And as he's doing so, he lost control of my hands. And I fell, and his hands are behind him. So he does fall face first. And again, the officers know where they are. They're in a padded cell. So the risk of injury is actually pretty low. Which brings me to a point one of the other justices brought up on the issue of qualified immunity. I would say that there is no case that would tell these officers under these facts that what they did was constitutionally prohibited. Mr. Dwyer points to the Bell case. Well, Bell is talking about strip searches specifically. And that the strip search needs to be done in a reasonable manner. Meaning when you are intrusively searching somebody by looking at their genitals, you have to do that in a reasonable manner. That's Bell. I think that Middlefield case that he also references is just a general case about the law on searches and seizures. And then Headwater, which is the Ninth Circuit case that he points to, I believe is a pepper spray case. Actually, I think, Your Honors, as I recall when I read that case. And so there is not a case out there that would tell these jailers that in the context of collecting evidence, if somebody turns around several times, which is not disputed, that they don't have a right to take the person to the ground to control them in order to collect the evidence. There is no law. And that is the second prong of the qualified immunity analysis, that there has to be something that would put these officers, these specific officers on notice. And there isn't. Your Honors, if there's no other questions, I am done. Okay. Thank you, Counsel. Thank you very much. I appreciate it. All right, Mr. Dwyer, you reserve some time. Yes. I will request that the Court read carefully the reply brief because almost all of the issues Mr. Fessenden raised were addressed in great detail in the reply brief and they are rebutted thoroughly. But let me go through the prime points. Number one, Lieutenant Mays, the official representative of the Sheriff's Department in the ABB 6th deposition testified that the written document that's been marked as the written policy was in fact the operative policy for the search that was conducted, undisputed. Lieutenant Mays testified that, in fact, the written policy was abandoned and they simply now have a policy of relying upon their general use of force policy. Well, the problem there is that there are no specific policies in place that inform of the search that before they use force in a search, they first have to use non-force means to gain compliance. So, for example, in the written policy, it's stated that if they're uncooperative, you put them in a cell by themselves until they cooperate. All of those protections were abandoned. In addition, Lieutenant Mays was asked, what are the criteria for when officers can use force in a search? And he could not enunciate any. Let me go back to a few more things that were misstated. If you look at the video, you will see that that is not a padded cell. That is a hard floor with them walking on it. You can see no depression from the energy of the feet. They may have a coat of epoxy paint, but it's not even foam paint. I don't know why they keep making that argument. The video just proves that on its face. He makes a statement that they kind of negligently, he kind of slipped and dropped to the floor. That was not my client's testimony. Again, in my reply brief, I go through in detail my client's testimony where in fact he said that they dropped him on the floor. They picked up his legs. One officer had each leg. Deputy Hopek had his hands. They held him up in the air, probably 12 to 16 inches in the air would be my best guess. Maybe a little bit more. And they let go. Why were they doing that when they admitted on the record that he had cooperated and taken off his shirt, taken off his shoes, and taken off his socks without incident? All of a sudden, in order to do those things, you have to turn away from a wall. You can't stand facing a wall and do those things. He cooperated, took off his clothes, and all of a sudden, as Deputy Hopek has admitted, grabs his arms behind his back in a thumb hold. What's my client supposed to do? He can't take off his pants. So they pick him up in the air. They're pulling up his legs and they drop him on the floor. Then Deputy Hopek gets on his back. Look at the video of the position that they're holding my client when he gets near the end, when they're done. They've got him hog-tied, hog-crossed with his legs, a hook as a man. He has his knee across his upper chest, upper back onto his neck, crushing my client. There was absolutely no need for that as all the officers testify, all of them, even Deputy Hopek. My client never physically resisted. In order for you to win... All he had to do was ask me to take his pants off. In order for you to win, you have to show that the officers intentionally threw your client to the floor rather than slipped out of his hands? Well, Your Honor, I think that the use of force was intentional because they intentionally grabbed his hands. They intentionally and knowingly grabbed his legs and lifted him into the air. I don't have to show intent that they meant to cause physical harm. We have to show, and we have shown, that they physically did these things, these physical acts, which endangered my client and were unnecessary. Yes, for example, in Rice v. Morehouse, they did the same maneuver. It's not that the officers were necessarily saying that they did the maneuver when there was no justification for the control maneuver. That is an unnecessary use of force. So this is not really a negligence question. This is a question of whether or not any force was necessary. The record proves it was not. And the fact that my client was significantly injured is the responsibility of these officers. There was a written policy in place that if they had followed it, it wouldn't have happened. In addition, Lieutenant Mays was asked a specific question. He was asked, is there a separate policy for just collecting clothing and doing an actual strip body cavity search? He said, no, this written policy document covers both events. In addition, the last point I want to make is my client testified he had two strip searches. This one that led to his injury and it was not a body cavity search. It was simply they needed to get his clothes for evidence for Officer Hall to take away. Well, all they had to do was put him in the room, give him his paper clothing, put the bag in there and say strip, put on your paper clothes, hand out the bag. But at the end of that, there was no need for any officers to do anything to him. They simply needed to put him in a room, say strip, here's your paper clothing and hand it over to Officer Hall.   And that's the end of my research. I won't describe it, but you can imagine what it is. All inmates go through that. Nothing was found. Any further questions? The case is clearly it's been argued well and it's fully submitted in the brief. I'm quite willing to submit it to the court. Thank you very much. Thank you. All right. This court for this session stands adjourned. Thank you.
judges: Siler, WARDLAW, SMITH